FILED ENTERED
RECEIVED

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SEP 2 9 2000

AT BALTIMORE
CLERK DISTRICT COURT
DISTRICT OF MARYLAND
By                                DEPUTY

```
DR. M. HARVEY BRENNER, ET AL.   :
                                :
                                :
        v.                      :       CIVIL NO. CCB-97-313
                                :
THE JOHNS HOPKINS UNIVERSITY,   :
ET AL.                          :
                                :
                          ...o0o...
```

## MEMORANDUM

On January 31, 1997, Dr. M. Harvey Brenner and Dr. Doris
Storms filed suit against The Johns Hopkins University ("the
University") and the Johns Hopkins Faculty and Senior Staff
Retirement Plan, claiming violations of the Employee Retirement
Income Security Act ("ERISA"), 29 U.S.C. §§1001-1461 (2000). Now
pending before this court are Defendants' Motions for Summary
Judgment on the Claims of Plaintiff Dr. M. Harvey Brenner and Dr.
Doris Storms, submitted pursuant to Rule 56 of the Federal Rules
of Civil Procedure.  This matter has been fully briefed and no
hearing is necessary. See Local Rule 105.6.  For the reasons
that follow, the Defendants' Motion For Summary Judgment as to
Dr. Brenner will be granted and the Defendants' Motion for
Summary Judgment as to Dr. Storms will be denied in part and
granted in part.

### STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides
that:

-1-



[Summary judgment] shall be rendered forthwith if the
pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material fact
and that the moving party is entitled to a judgment as a
matter of law.

A genuine issue of material fact exists if there is
sufficient evidence for a reasonable jury to return a verdict in
favor of the non-moving party. Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986); Shaw v. Stroud, 13 F.3d 791, 798 (4th
Cir. 1994). In making this determination, the evidence of the
party opposing summary judgment is to be believed and all
justifiable inferences drawn in her favor. Halperin v. Abacus
Tech. Corp., 128 F.3d 191, 196 (4th Cir. 1997) (citing Anderson,
477 U.S. at 255). The non-moving party may not rest upon mere
allegations or denials in her pleading, however, but must set
forth specific facts showing that there is a genuine issue for
trial. Anderson, 477 U.S. at 248; Allstate Fin. Corp. v.
Financorp, Inc., 934 F.2d 55, 58 (4th Cir. 1991). The "mere
existence of a scintilla of evidence in support of the
plaintiff's position" is not enough to defeat a defendant's
summary judgment motion. Anderson, 477 U.S. at 252.

BACKGROUND

A.   The Johns Hopkins Faculty and Senior Staff
     Retirement Plan

On July 1, 1969, Johns Hopkins University ("the University")
adopted a TIAA/CREF retirement plan for its employees known as
the Faculty and Senior Staff Retirement Plan ("the Retirement
Plan"). (Letter of April 11, 1969, Def. Ex. 2.)  The Retirement
Plan required eligible employees to voluntarily contribute six
percent of their salaries beyond a minimum threshold determined
by law.  (Id.)  The University would then contribute an amount
equal to twelve percent of the employees' total base salary.
(Id.)  While the general outlines of the plan have remained
consistent since its inception, the plan was amended in January
1983 to expand the number of investment opportunities for
participants. (Letter of September 30, 1982, Def. Ex. 7; Summary
of Retirement Plan, Def. Ex. 9.)

In order to become a participant in the plan, an eligible
employee had to satisfy two requirements.  First, an employee
either had to be age thirty-five or had to have completed two
years of service, whichever came first. (Letter of April 11,
1969, Def. Ex. 2; Summary of Retirement Plan at 2, Def. Ex. 9.)
Second, an employee was required to complete an enrollment
application form and a payroll deduction form as well as decide
among a number of investment options.  (Aff. of Frank P. Kellner,
Jr. at ¶ 6, Def. Ex. 39.)

-3-

Two categories of employees were considered eligible for the
Retirement Plan: full-time and part-time faculty and senior
staff. (Letter of April 11, 1969, Def. Ex. 2; Summary of
Retirement Plan at 2, Def. Ex. 9.) The terms "faculty" and
"senior staff" were not always clearly defined at Hopkins. For
instance, until 1995, the non-tenured faculty track included
instructors and research associates, as well as senior research
associates and senior scientists. (Excerpt of Article, Pl. Ex.
14.) Eligibility for the Retirement Plan, apparently,
corresponded to the position classification numbers ("PCNs")
assigned to employees by the University. Faculty members were
assigned numbers in the 100 series; officers and deans were
assigned numbers in the 200s; senior or professional staff were
assigned numbers in the 300s; and support staff was assigned
numbers in the 400, 600 and 700 series. (Dep. of Frank P.
Kellner at 54-55, Pl. Ex. 4.) Often employees did not fully
understand the significance of these PCNs. (See Aff. of Dr.
Doris Storms at ¶ 25, Pl. Ex. 8.)

Before the enactment of the Employee Retirement Income
Security Act ("ERISA") in 1975, the University relied on the
Office of Benefits Administration (or its predecessor the Office
of Personnel Benefits) to initially notify an employee of his or
her eligibility status through a welcome letter. (Letter of
September 13, 1972 to Doris Storms, Pl. Ex. 25.) The University

-4-

would send an additional notification if an employee's eligibility status was updated.  These memoranda briefly informed an employee of his or her eligibility for personnel benefits and directed the employee to contact the appropriate divisional personnel office for more information.  (Memorandum to Dr. M. Harvey Brenner, Def. Ex. 8; Memorandum of July 10, 1973 to Doris Storms, Pl. Ex. 26.)

Each of these memoranda ordinarily was distributed to employees through a campus wide network of interoffice mail. (Dep. of Frank P. Kellner, Jr. at 22, Pl. Ex. 4.)  A separate copy of each letter or memorandum was supposed to be sent to each divisional personnel office. (Dep. of Bernardine Kuczak at 16, Pl. Ex. 20.)  This enrollment process was fairly decentralized with each division of the University determining its individual record-keeping procedures.  (Dep. of Frank P. Kellner, Jr. at 109, Pl. Ex. 4.)

The University revised its notification procedure after the enactment of ERISA in 1975.  In order to comply with ERISA, the University published at least two major Summary Plan Description ("SPDs"), documents which are required to summarize the plan in easily understood terms.  See 29 U.S.C. § 1022 (a)-(b).  The University distributed an initial SPD in November 1977.  (Supp. Aff. of Frank P. Kellner, Jr. at ¶7, Mem. and Att. of December 12, 1977, Def. Rep. Br. Ex. 1.)  After this initial SPD, another

major amendment was published in 1984. (Summary of Retirement Plan (1984), Def. Ex. 9.) After 1984, the University also produced updates of the amended SPDS in June 1986, July 1988, March 1990 and March 1991. (Pl. Sur. Mem. Ex. 3; SPD of June 1986, Def. Ex. 10; SPD of July 1988, Def. Ex. 34; SPD of March 1990, Def. Ex. 35; SPD of March 1991, Def. Ex. 36.)

These SPDs explained a number of key terms. First, the SPDs explained that faculty and senior staff members could participate in the plan, once they had achieved eligibility and "upon completion of an application form." (Summary of Retirement Plan, Def. Ex. 9.) Second, the SPDs explained that participation in the plan was voluntary. (Id. at 2.) Third, the SPDs explained that once a participant made a six percent plan contribution out of his or her salary, the University would make a "substantial contribution to the plan on your behalf." (Id. at 1, 4.) Finally, until 1986, the introduction advised participants to "See your annual Benefits Statements to determine how much you and the University each contribute to the Plan." (Summary of Retirement Plan at 1, Def. Ex. 9;SPD at 1 of June 1986, Def. Ex. 10.)

There is conflicting testimony over how the various SPDs were distributed. Frank P. Kellner, Jr., the Senior Director of the Office of Benefits Administration, claimed that the University sent the initial SPD and all subsequent amendments to

-6-

the home address of faculty and senior staff members by first class mail. (Aff. of Frank P. Kellner, Jr., Def. Ex. 39 at ¶26). Kellner's claims were contradicted, however, (for at least one year), by Sandra Cobb, the Manager of Worklife Programs for the Office of Benefits Administration, who stated that the SPDs for faculty and senior staff were sent to full-time faculty and senior staff through the campus wide mail system. (Aff. of Sandra Cobb at ¶7; Memorandum of June 17, 1987, Def. Rep. Br. Ex. 2.) In addition to individual distribution, whether by first class or internal campus mail, copies of each published SPD were deposited at each Divisional Personnel Office and the Office of Benefits Administration. (Memorandum of June 17, 1987, Def. Rep. Br. Ex. 2; Dep. of Bernardine Kuczak at 40, Pl. Ex. 20.)

The University and each of its divisions also adopted a number of informal notification practices. From 1974 to 1985, the University sent participants an "Annual Statement of Benefits" that summarized the available benefits and how these benefits applied to each participant. Among the information analyzed on the form, the "Annual Statement of Benefits" contained four lines that summarized the contributions an individual made to the Retirement Plan as well as any matching contributions made by the University. If an individual was not enrolled in the Retirement Plan, the amounts of contribution would be listed as zeros and a notation would appear that the

-7-

employee was not participating in the plan.  The University

distrubuted these statements annually.  (Aff. of Frank P.

Kellner, Jr. at ¶30, Def. Ex. 39; Sample Statements of Annual

Benefit, Def. Ex. 45-46).

Periodically, the University would also distribute

newsletters examining the issues raised by the Retirement Plan.

These "Retirement Updates" were sent out sporadically-two in

1986, one in 1988, and one in 1992.  The Retirement Updates in

December 1986 and December 1988 contained messages directed at

individuals who were not participating in the program.

(Retirement Updates, Def. Ex. 14-18.)  An additional newsletter,

Human Resources Today, also discussed issues raised by the

Retirement Plan.  (Human Resources Today, Def. Ex. 19.)

The separate divisions of the University also adopted a

number of different notification procedures.  After it separated

from the School of Medicine in 1978, the School of Hygiene and

Public Health ("the School of Public Health") conducted

orientation interviews soon after a new employee was hired or

rehired.  At these orientations, an employee of the human

resources department would discuss with the new hire or rehire

the kinds of benefits, including the Retirement Plan, offered by

the University.  (Dep. of Anne Muller at 39, Def. Ex. 38.)

During this orientation interview, the human resources staff

typically would discuss a number of different benefits packages.

-8-

There were at least two orientation packages offered: (1) a
general orientation package that was offered to faculty and
senior staff new hires, and rehires who were not eligible for the
retirement package at the time of their initial orientation; and
(2) a more specialized package that was offered to faculty and
senior staff new hires or rehires who were eligible for
retirement at the time of the orientation. (Id.)

After receiving the orientation package, the employee would
then sign a personal benefits election form that would indicate
the employee's choices of benefits.  The personal benefits
election form indicated whether: (1) an employee had elected to
participate in the medical plan and the dental plan; and (2)
whether an employee had elected to adopt personal account
insurance, dependent life insurance, a medical reimbursement
account, or a dependent care reimbursement account. (Personal
Benefits Elections Form, Pl. Ex. 15.)  Unlike the Annual
Statement of Benefits, the Personal Benefits Election Form did
not separately analyze an employee's retirement options.

The University funded its various benefits programs through
a number of different sources, including payments derived from
grants and outside contracts.  Grants and outside contracts could
provide the bulk of funding for an employee's salary and benefits
(such as retirement) for any given year. (See e.g. Aff. of Dr.
M. Harvey Brenner at ¶9, Pl. Ex. 1; Budget Development Guide at

-9-

5, Pl. Ex. 5.)  If the majority of an employee's salary was derived from grants or outside contracts, the granting institution would have to allocate a certain amount of the grant or contract to employee benefits such as social security, unemployment compensation, retirement plans, flexible medical, dental and life accounts, disability benefits, tuition plans and administrative costs. This was known as the "fringe benefit rate."  (Budget Development Guide at 5, Pl. Ex. 5.)

Payments received as a result of the fringe benefit rate were not designated for individual employees who had retained the grant or contract but rather would be designated for the "fringe benefit pool."  The fringe benefit pool aggregated all of the monies derived from grants, contracts or other outside sources into a series of accounts that funded all employee benefits. (Dep. of Kenneth Hoffmeyer at 65, Def. Ex. 26.)  The actual fringe benefit rate was calculated by averaging the cost of employee benefits for faculty and senior staff for an entire year.  (Id. at 69.)  If there were cost overruns or other changes in cost associated with the program, these would be taken into account in calculating the next year's fringe benefit rate.  The University's practices were not unusual and, in fact, arose partly as a result of yearly negotiations with the common granting institutions such as the federal government.  (Id. at 77.)

-10-

B.    Claim of Dr. M. Harvey Brenner

Dr. M. Harvey Brenner, a tenured Professor at the Johns Hopkins School of Public Health, has been employed by the University for over twenty-eight years. (Aff. of Dr. M. Harvey Brenner at ¶7, Pl. Ex. 1.)  He was recruited by the University from Yale University in 1972. (Letter of April 24, 1972, Pl. Ex. 3.)  He became a fully tenured professor in 1979. (Dep. of Dr. M. Harvey Brenner at 13, Def. Ex. 22.)

At the time of his recruitment, Dr. Brenner was told that there was a Retirement Plan available for him. (Aff. of Dr. M. Harvey Brenner at ¶4, Pl. Ex. 1.)  The year after he arrived, in 1973, the University's Office of Personnel Benefits sent Dr. Brenner a memorandum at his campus address advising him of his eligibility to participate in the University's TIAA/CREF Retirement Plan and that he needed to "arrange for completion of enrollment and payment authorization forms" if he wished to enroll."  (Mem. of August 23, 1973, Def. Ex. 8.)[1]  Dr. Brenner, however, claims he was never told that he was not automatically enrolled in the program, and that no one gave him the terms of the Plan until 1994. (Aff. Of Dr. M. Harvey Brenner at ¶8, Pl. Ex. 1.)  He denies receiving any of the written materials discussed above regarding the Retirement Plan from 1972 until

_____

[1]The memorandum also stated that "a brochure and a brief description of the plan are enclosed." (Mem. Of August 23, 1973, Def. Ex. 8.)

-11-

1994.   (Id. at ¶¶16-20.)

The University has offered evidence that it made efforts to contact Dr. Brenner about his retirement options beyond the written materials distributed generally to all eligible participants.  In March 1, 1984, the Pension and Retirement Plans Study Committee sent a letter identifying twenty-eight faculty or senior staff members who were forty years or older and had completed five or more years of service at the University, but had not enrolled in the Retirement Plan.  The University encouraged the deans of each of its divisions (including Dean Donald Henderson, the dean of the School of Public Health at the time) to contact full time faculty members who were not participating in the program.  Dr. Brenner was one of the four members of the School of Public Health to be contacted.  (Letter of March 1, 1984, Def. Ex. 3.) [2]

On March 8, 1984, Dean Henderson drafted a letter to Dr.

---

[2]In this letter to Dean Henderson, Robert Wilson, the Director of the Pension and Retirement Plans Study Committee, stated that:

> I would suggest that you write each of these individuals and remind them of the great value of the University's retirement plan and the importance of the early years' accumulations in providing financial security in retirement. It seems to me that it is also important, as a matter of record, that followup be made by you or the department chairman or director and personnel files noted if the individuals choose not to enroll.  If you prefer and will provide a copy of your letter, Frank Kellner and I will assume this followup responsibility for you."

(Letter of March 1, 1984, Def. Ex. 3.)

Brenner about his enrollment. (Letter of March 8, 1984, Def. Ex. 12.) The letter stated that "participation in the plan is not a condition of continued employment, but as a Dean and a colleague, I would request that you seriously reconsider the possibility of joining the plan." (Id.) After discussing the available retirement options, the Dean further stated that "I can well appreciate that you may have good reasons for not participating in the Retirement Plan, but I wanted to be sure that you had a full understanding of its benefits and that your decision was taken with full knowledge." (Id.) Frank Kellner of the Office of Benefits Administration was supposed to contact Dr. Brenner to follow-up with more information about the Retirement Plan. (Id.)

Dr. Brenner denies receiving this letter. (Aff. of Dr. M. Harvey Brenner at ¶17, Pl. Ex. 1.) The copy of the letter attached as Def. Ex. 12 is not signed by Dean Henderson. Two other letters sent out on this date (March 8, 1984) are signed by Dean Henderson and also are on the School of Public Health letterhead. (Letter to Dr. Julia Hawkins; Letter to G. Kenneth Adams, Pl. Ex. 23).³

In his deposition, Dean Henderson could not specifically recall whether the letter to Dr. Brenner was sent out, although he assumed that it had been because the other two letters were

---

³The fourth person was not contacted because he was terminating employment in four months. (Letter of March 8, 1984, Def. Ex. 12.)

-13-

delivered to their recipients. (Deposition of Donald Henderson at 13-14, Pl. Ex. 24.) The letter contained a blind carbon copy notation to Frank P. Kellner. (Letter of March 8, 1984, Def. Ex. 12.) Mr. Kellner's copy has a handwritten notation of Dr. Brenner's telephone extension. (Id.) Mr. Kellner recalls that he did attempt to contact Dr. Brenner but cannot recall whether he personally spoke with Dr. Brenner about the matter or left him a telephone message. (Aff. of Frank P. Kellner, Jr. at ¶38, Def. Ex. 1.)

There is also evidence that another attempt was made to enroll Dr. Brenner into the University's Retirement Plan in 1988. According to Mr. Kellner, William Pipkin, Assistant Dean from the School of Health and Hygiene volunteered to contact Mr. Brenner about enrolling in the Retirement Plan. (Aff. of Frank P. Kellner, Jr. at ¶40-41, Def. Ex. 1.)

Dr. Brenner has denied he had any such conversation with Mr. Pipkin. (Aff. of Dr. M. Harvey Brenner at ¶13, Pl. Ex. 1.) Unfortunately, Mr. Pipkin has died and there is no other direct witness to the alleged conversation. The University has offered the testimony of Patricia Bradshaw, Mr. Pipkin's assistant at the time. Ms. Bradshaw has testified that there were several meetings between William Pipkin and Dr. Brenner during her employment with Mr. Pipkin. (Dep. of Patricia Bradshaw at 37, Def. Ex. 25.) After two of these meetings, Mr. Pipkin expressed

-14-

to her with frustration that he had discussed the issue with Dr. Brenner and could not understand why Dr. Brenner would not sign up for retirement benefits. [4]

C. Claim of Dr. Doris Storms

Dr. Doris Storms began working for the University in September 1972 in a now defunct division of the school, the Johns Hopkins University School of Health Services. She served as the Assistant to the Dean, Program Evaluations. (Curriculum Vitae of Dr. Doris Storms, Pl. Ex. 2.) Dr. Storms was not initially eligible for the Retirement Plan. (Aff. of Frank P. Kellner, Jr. at ¶13, Def. Ex. 39.)

In July of 1973, Dr. Storms received a raise and became eligible for retirement with a PCN number of 341. (Id. at ¶15.) The University notified Dr. Storms of her eligibility in a short memorandum on July 10, 1973. The memorandum stated that Dr. Storms was now eligible for a "professional personnel benefits plan." This term was not defined in the body of the memorandum, however, and only a brief notation at the bottom of the page indicated that Dr. Storms was eligible for the TIAA-CREF retirement plan. There is no indication that a brochure describing the plan was attached. (Memorandum of July 10, 1973, Pl. Ex. 26.) Dr. Storms does not recall if she received the

---

[4]The defendants have reserved the right to file a motion discussing why this statement should be admissible under the residual hearsay exception. (Def. Rep. Mem. at 19.)

memorandum. (Aff. of Dr. Storms at ¶21, Pl. Ex. 8.)

After three years at the School of Health Services, Dr. Storms left the program in 1976, to pursue graduate studies at the School of Public Health. (Id. at ¶8.) During her initial employment with Hopkins, Dr. Storms was eligible for the Retirement Plan from July 1, 1973 to September 30, 1976. (Aff. of Frank P. Kellner, Jr. at ¶39, Def. Ex. 39. )

On October 1, 1977, Dr. Doris Storms accepted a new position at the Department of International Health as a Research Associate. (Aff. of Dr. Doris Storms at ¶9, Pl. Ex. 8.) In this capacity, she assisted with teaching duties, conducted research in India and managed a healthcare grant in Jamaica. (Curriculum Vitae of Dr. Doris Storms, Pl. Ex. 2.) As an Research Associate, the University considered her eligible for retirement and assigned her a PCN of 361. (Aff. of Frank P. Kellner, Jr. at ¶33, Def. Ex. 39.) Dr. Storms claims that she was unaware of her eligibility, stating that she did not receive an orientation from the school in 1977 because of her prior work experience and her status as a part-time student at the University. (Aff. of Dr. Doris Storms at ¶10, Pl. Ex. 8.)

Other documents indicate that there was some confusion about her role at the University. In a memorandum sent to the chair of the Department of International Health, the Dean of the School of Public Health, Donald Henderson, noted that there was confusion

-16-

over her appointment as a Research Associate because "there seems
to be so many unwritten policies which are understood to be
operative in so many different ways by so many people that I get
rather lost in the process." (Memorandum of October 25, 1977,
Pl. Ex. 13.)  During this period, the Office of Benefits
Administration referred to Dr. Storms by a separate title
("Associate Research Scientist.")  Although her duties as a
Research Associate continued, in February 1978, Dr. Storms was
transferred to the School of Public Health, where she remained
until she left the program in August 1979.   In total, Dr. Storms
spent two years in her capacity as a Research Associate from
October 1, 1977 to August 13, 1979.  (Aff. of Frank P. Kellner,
Jr. at ¶39, Def. Ex. 39.)

     From 1979 to 1982, Dr. Storms was not eligible for
retirement benefits because she worked in a part-time or
temporary capacity at the School of Public Health.  (Id. at ¶35-
38.)  After 1982, Dr. Storms terminated her employment at the
University to pursue her doctoral studies.  In 1986, as part of a
cooperative program with the United States Agency for
International Development, Dr. Storms returned to the University
as an Associate (this term was later amended to Research
Associate in 1993).  As an Associate, Dr. Storms directed a
number of programs that provided aid to international voluntary
organizations implementing child survival programs.  She was

-17-

promoted to a Senior Associate in 1998. (Aff. of Dr. Doris
Storms at ¶12, Pl. Ex. 8; Curriculum Vitae of Dr. Doris Storms,
Pl. Ex. 2.) Dr. Storms has worked for the School of Public
Health for fourteen years since her return in 1986.

Dr. Storms was eligible for retirement upon her return to
the University in 1986. The University considered her a full-
time employee and assigned her a PCN of 181. (Aff. of Frank P.
Kellner, Jr. at ¶41, Def. Ex. 39.) There is conflicting
testimony over whether she actually received information about
her retirement benefits. Dr. Storms denies receiving any written
materials or participating in an orientation interview in 1986.
(Aff. of Dr. Doris Storms at ¶14, Pl. Ex. 8.) Dorothy Boan, an
employee of the School of Public Health, responsible for
administering orientation interviews in 1986, does not
specifically recall conducting an orientation interview with Dr.
Storms nor does she recall hand delivering or mailing any of the
orientation packages distributed at the time. (Dep. of Dorothy
Boan at 25, 29-30, Pl. Ex. 28.) However, documentary evidence in
the form of a contemporaneous note written by Dorothy Boan to a
colleague attached to a Personal Benefits Election form signed by
Dr. Storms appears to indicate that there was a discussion about
a number of personnel benefits. Neither the election form nor the
note specifically refer to the retirement program. (Note re
Benefits, Pl. Ex. 30.)

-18-

Dr. Storms claims that she did not receive any written materials regarding her retirement benefits, including the initial SPD which had been distributed in November 1977 or any of the Annual Statements of Benefits. (Aff. of Dr. Doris Storms at ¶23-24, Pl. Ex. 8.) Furthermore, she claims that she thought she was not eligible for the Retirement Plan because of her belief that the term "faculty and senior staff" did not apply to her, since as a Research Associate she was not allowed to be on committees or be an advisor to students. (Dep. of Dr. Doris Storms at 22, Def. Ex. 50.)[5]

## ANALYSIS

It is agreed that the Hopkins Faculty and Senior Staff Retirement Plan is a "pension plan" within the definition of ERISA, 29 U.S.C. § 1002(2)(A); that the plaintiffs are "participants," 29 U.S.C. § 1002(7); and that the University is the plan administrator, 29 U.S.C. § 1002(16), and a "fiduciary" under 29 U.S.C. § 1102. Jurisdiction arises under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.[6]

---

[5] Dr. Storms' position on this particular issue has not always been consistent. The initial complaint stated that she was employed as a senior staff member and that she understood she was participating in the retirement system. (Second Amended Complaint (Redlined Version) at 2, Def. Ex. 49.) This is an issue of credibility that should not be resolved on summary judgment.

[6] Even though some acts or omissions occurred before the effective date of ERISA, the claim did not accrue until benefits

-19-

The Second Amended Complaint in this case contains six counts. Count I alleges a breach of fiduciary duty under ERISA § 404(a)(1) [29 U.S.C. § 1104(a)(1)] for imposing a duty or condition of enrollment without adequate notice to the plaintiffs. Count II, brought under ERISA § 403(c)(1) [29 U.S.C. § 1103(c)(1)], seeks recovery of grant funds that wrongfully inured to the benefit of the defendant University rather than the Plan and the plaintiffs. Count III alleges an attempt to "render forfeit" the plaintiffs' retirement benefits in violation of ERISA § 303(a) [29 U.S.C. § 1053(a)].

Counts IV, V, and VI are common law claims for breach of contract, breach of the duty of good faith, and unjust enrichment. These claims are preempted by ERISA, and will not be separately considered.[7]  See Elmore v. Cone Mills Corp., 23 F.3d 855, 863 (4th Cir. 1994).[8]

As relief, the plaintiffs seek either damages or restitution in the amount to which they would be entitled in retirement benefits if the defendants had deemed them enrolled in the Plan

---

were denied. Therefore, jurisdiction under ERISA applies. Rodriguez v. MEBA Pension Trust, 872 F.2d 69, 72-3 (4th Cir. 1989).

[7]The plaintiffs voluntarily withdrew Counts IV and V.

[8] The Fourth Circuit has held that ERISA incorporates a remedy for unjust enrichment under certain circumstances. Provident Life & Accident Ins. Co. v. Waller, 906 F.2d 985, 999 (4th Cir. 1990).

as of the date they were first eligible to participate.[9]

The central dispute in this case is the plaintiffs' claim
that the defendants breached their fiduciary duties by (1)
failing to provide Dr. Brenner adequate notice that he needed to
enroll in the retirement plan in order to receive benefits and
(2) failing to provide Dr. Storms adequate notice of both her
eligibility for the plan and her need to enroll.  ERISA requires
a fiduciary to

> discharge his duties with respect to a plan
> solely in the interest of the participants
> and beneficiaries and
>
> (A)  for the exclusive purpose of:
>      (1)  providing benefits to participants
>           and their beneficiaries; and ....
>
> (D)  in accordance with the documents and
>      instruments governing the plan ....

29 U.S.C. §1104(a).  ERISA also imposes various notice
requirements.  The plan administrator must furnish to each
participant a copy of the summary plan description and a copy of
any "material modification" or change by certain specified
deadlines, and must provide updated copies every five years (or
ten years if the plan has not been amended).  See 29 U.S.C. §§
1024(b),1022.

The Fourth Circuit has held that the general fiduciary duty

---

[9] The plaintiffs' request for an order directing the
defendants to advise other persons of their past eligibility has
been withdrawn.

standard cannot be used to expand the notice requirements imposed
on fiduciaries under ERISA § 104(b)(4) [29 U.S.C. § 1024(b)(4)],
which relates to providing copies of certain documents on
request. Faircloth v. Lundy Packing Co., 91 F.3d 648, 657 (4th
Cir. 1996). In that case, however, the plaintiffs contended they
needed the additional information in order "to exercise an
oversight role regarding the ESOP [Employee Stock Ownership
Plan]" in which they were participants. Id. at 658. They did
not allege that they had been misled or that there was a failure
to disclose when the fiduciary knew that failure might be harmful
to a beneficiary. Id. at 657-58; cf. Bixler v. Central
Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1299-
1300 (3rd Cir. 1993); Rodriguez, 872 F.2d at 73-74 (relying on
fiduciary duty in 29 U.S.C. § 1104 and specific disclosure
requirements in 29 U.S.C. § 1022(a)(1) and 1024(b)(1) to enforce
duty to provide effective notice of any change that might affect
a participant's pension rights); Franklin v. First Union Corp.,
84 F.Supp. 2d 720, 734-35 (E.D.Va. 2000)(finding that the company
had a duty to give notice of a merger, changes in investment
opportunities, and options available).

In this case the plaintiffs allege a breach of fiduciary
duty for failure to provide notice that, as in Rodriguez, is
essentially coextensive with the notice requirements in §
1024(b). The summary plan description required by 29 U.S.C. §§

-22-

1022 and 1024(b) must be "sufficiently accurate and comprehensive
to reasonably apprise...participants...of their rights and
obligations under the plan," 29 U.S.C. § 1022(a), and must
contain "the plan's requirements respecting eligibility for
participation and benefits." Id. at § 1022(b). As discussed
above, the SPDs prepared by the University did in fact notify
participants of their need to complete an application and that
participation in the retirement plan was voluntary. The
plaintiffs, however, deny ever receiving any SPD or any of the
other forms of notice identified by the University.

There is no allegation of active concealment or affirmative
misrepresentation, nor can there be any credible dispute that the
SPDs and other written material, if received, were sufficient to
advise Dr. Brenner that participation was voluntary and that he
needed to enroll in the program in order to be entitled to
receive benefits. Nor is this is a case where a participant has
inquired about his or her eligibility and been provided an
insufficient response. See Rodriguez, 872 F.2d at 74 (finding
that the administrator's 1973 letter in response to the
beneficiary's request for clarification of his status was
insufficient to provide him a "fair opportunity" to pursue his
benefit options. See also Becker v. Eastman Kodak co.., 120 F.3d
5, 10 (2d Cir. 1997); Bixler, 12 F.3d at 1302; Eddy v. Colonial
Life Ins. Co. of America, 919 F.2d 747, 751 (D.C. Cir. 1990)

-23-

(holding that a fiduciary had the duty to provide "complete and correct material information" to a beneficiary who called and inquired about his status); cf. Maxa v. John Alden Life Ins. Co., 972 F.2d 980, 985-86 (8th Cir. 1992) (finding no fiduciary duty, absent inquiry, to inform an individual beneficiary of the specific impact of general terms of the plan on that beneficiary). From the record before me in this case, there is no indication that either Dr. Brenner or Dr. Storms took any steps to inquire or verify their assumptions about their eligibility or participation in the retirement plan until 1994.

Accordingly, the dispositive question as to Dr. Brenner is whether he received the SPDs and other written materials discussed above advising him that he needed to enroll in the retirement program in order to receive benefits.[10] Regulations promulgated by the Department of Labor require a plan administrator to use whatever measures are "reasonably calculated to ensure actual receipt of the material." 29 C.F.R. § 2520.104b-1(b)(1); see also Williams v. Plumbers & Steamfitters Local 60 Pension Plan, 48 F.3d 923, 926 (5th Cir 1995). Those regulations identify as acceptable methods of distribution both first-class mail and "in-hand delivery to an employee at his or her worksite," as compared to "merely [placing] copies of the

_____

[10]Unlike Dr. Storms, Dr. Brenner does not assert that he was unaware of his eligibility for the program, but rather that he thought he was automatically enrolled.

-24-

material in a location frequented by participants," which is not acceptable. 29 C.F.R. § 2520.104b-1(b)(1).

Because Dr. Brenner, as well as Dr.Storms, has denied receiving notice, the burden is on the University to prove compliance with its statutory responsibilities. See Stanton v. Larry Fowler Trucking, Inc., 52 F.3d 723, 728 (8ᵗʰ Cir. 1995) (placing burden on employer to show compliance with statutory notice requirements under COBRA once employee denied receiving notice); Southern Maryland Hospital Ctr. v. Corley, 6 F.Supp. 2d 461, 466 (D. Md. 1998)(same). As outlined above, the University has proffered substantial evidence of its compliance through distribution of memoranda, SPDs, Annual Benefit Statements, and related documents. Focusing on the SPDs, University officials offered evidence of distribution of an initial SPD in 1977, a revised SPD in 1984, and other updated SPDs. While there is a conflict about whether distribution was by first-class mail or delivery to individual campus addresses, both methods are acceptable under the regulations. The University does not rely on the use of second or third-class mail, or the placement of copies in a location frequented by participants, to demonstrate compliance.

The plaintiffs offer evidence that only two SPDs, the 1977 and 1984 versions, were filed with the Department of Labor as required by 29 U.S.C. § 1024(a). Assuming without deciding that a

lack of compliance with those requirements would also be evidence of noncompliance with the duty owed to participants, their filing nevertheless would suggest that at least two of the SPDs were distributed to eligible participants.

Dr. Brenner also contends that the fact the University has no record of his returning the waiver of enrollment statement contained in the August 1973 memorandum is evidence that he did not receive the memorandum. If that were the only written notice the defendants relied on, his argument would have more force. The waiver, however, was not a required form but only intended to impress on participants the importance of the choice they were making. It preceded the enactment of ERISA, after which the University took the steps outlined above to comply with its statutory duties. (See e.g. Supp. Aff. of Frank Kellner, Jr., at¶4-6., Def. Rep. Mem., Ex. 1.)

Beyond the required written notice, the University took additional steps to encourage Dr. Brenner's enrollment, including Dean Henderson's letter in 1984. While this cannot substitute for adequate written notice, see Canada Life Assurance Co. v. Estate of Lebowitz, 185 F.3d 231, 238 (4th Cir. 1999), it is evidence contradicting the claim that the University breached its fiduciary duty to participants.

In response to the substantial evidence presented by the University, Dr. Brenner relies on the unsurprising fact that

-26-

University employees have inconsistent or failed recollections of long-ago events and on his own denial of receiving any of the written (or oral) communications directed to him over the course of more than twenty years. This is not sufficient. See, e.g., I.V. Services of America, Inc. v. Inn Development & Management, Inc., 182 F.3d 51, 55-6 (1ˢᵗ Cir. 1999); Posey v. Skyline Corp., 702 F.2d 102, 106 (7ᵗʰ Cir. 1983); Southern Maryland Hosp. Ctr., 6 F. Supp. 2d at 466. Accordingly, the defendants' motion for summary judgment on Count I will be granted as to Dr. Brenner.

Dr. Storms's claim rests on a set of facts somewhat different from the facts applicable to Dr. Brenner. When first hired she was not eligible to participate in the plan. The memorandum sent to her when she became eligible refers to personnel benefits generally and did not direct her to submit either an enrollment form or a waiver. (Mem. Of July 10, 1973, Pl. Ex. 26). Whether her status as, e.g., a "research associate," fell within the category of "faculty and senior staff " covered by the plan was not well-defined within the SPDs or elsewhere. While there is evidence that she was contacted concerning her benefits in 1986, there is no specific evidence that this contact included information about the retirement program. Nor, apparently, were efforts made to encourage her enrollment such as those directed at Dr. Brenner. Accordingly, without resolution of credibility issues inappropriate for

-27-

summary judgment, the University has not demonstrated compliance with its statutory obligation to Dr. Storms. The defendants' motion for summary judgment will be denied as to her claim for breach of fiduciary duty.[11]

The plaintiffs advance two other ERISA claims, which are not persuasive. Count II is brought under 29 U.S.C. § 1103(c)(1), which provides that plan assets "shall never inure to the benefit of any employer." The plaintiffs assert that some portion of the grant money allocated for fringe benefits inured to the University's benefit because it was used to fund other employees' benefits, and that the remedy is for the University to "disgorge" this money to the plaintiffs as retirement benefits. Assuming that this falls within a theory of unjust enrichment, it does not meet the equitable criteria established by the Fourth Circuit to prevail on such a claim. See Elmore, 187 F.3d at 449; Provident Life, 906 F.2d at 993-94. Nor is it all clear that the funds at issue in fact benefitted the University. (See Hoffmeyer Dep., Def. Ex. 26.)

Finally, the plaintiffs assert a violation of 29 U.S.C. § 1053(a)(2)(B) related to vested benefits which cannot be

_____

[11]The extent of the equitable remedy that may be available to Dr. Storms need not be determined at this time. See, e.g., Rodriguez, 872 F.2d at 74 (offering plaintiff the choice of accepting his present pension benefits or the benefits that would have accrued had the option been exercised, offset by payments already received).

forfeited.   This applies to participants who have otherwise
complied with the plan and attained the right to certain benefits
based on length of service.   See Cotter v. Eastern Conf. of
Teamsters Ret. Plan, 898 F.2d 424, 428 (4th Cir. 1990); Duchow v.
New York State Teamsters Conf. Pension & Ret. Fund, 691 F.2d 74,
80 (2d Cir. 1982).   It is not applicable in this case.

A separate Order follows.

Sept. 29, 2000
Date

Catherine C. Blake
United States District Judge

-29-