```
                                                      ____FILED      ____ENTERED
                                                      ____LODGED     ____RECEIVED
      IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF MARYLAND                    JAN   2 2002
```
```
                                                      CLERK U.S. DISTRICT COURT
                                                       DISTRICT OF MARYLAND
```

DR. M. HARVEY BRENNER and           :
DR. DORIS L. STORMS                 :
                                    :
v.                                  :       CIVIL NO. CCB-97-313
                                    :
JOHNS HOPKINS UNIVERSITY, ET AL.    :
                                    :

...oOo...

## MEMORANDUM

A bench trial was held June 4, 2001, followed by oral argument on October 4, 2001, on claims brought by Dr. Doris Storms against the Johns Hopkins University ("the University") and the Johns Hopkins Faculty and Senior Staff Retirement Plan ("the Plan") under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. What follows constitutes the court's findings of fact and conclusions of law under Fed. R. Civ. P. 52. For the reasons stated, judgment will be entered in favor of the defendants.

Many of the relevant facts and legal principles were set forth in the Court's Memorandum of September 29, 2000 granting in part and denying in part summary judgment, and will not be repeated here.[1] The remaining claim is an alleged breach of fiduciary duty under 29 U.S.C. § 1104(a)(1) for failing to provide adequate notice to Dr. Storms of her eligibility for the retirement plan and the corresponding need for her to apply in order to participate. The dispositive question presented for resolution at trial was whether the University met its fiduciary and statutory duty to provide adequate notice to Dr. Storms. The burden is on the University to prove that it distributed documents sufficient to advise Dr. Storms of her rights by methods "reasonably calculated to ensure actual receipt of the material." 29 C.F.R. 2520.104b-1(b)(1); see also

---

[1] The Memorandum, which granted summary judgment to the defendants as to the claims of Dr. Harvey Brenner, is incorporated herein by reference.

Stanton v. Larry Fowler Trucking, Inc., 52 F.3d 723, 728-29 (8th Cir. 1995); Williams v. Plumbers & Steamfitters Local 60 Pension Plan, 48 F.3d 923, 926 (5th Cir. 1995); Rodriguez v. MEBA Pension Trust, 872 F.2d 69, 73-4 (4th Cir. 1989); Southern Md. Hosp. Ctr. v. Herb Gordon Auto World, Inc., 6 F.Supp. 2d 461, 466 (D. Md. 1998).

As more fully explained below, the principal reason for finding the University has satisfied its burden is the sheer volume of material sent to Dr. Storms over the years from 1973 to 1994.[2] Further, the language used in the documents was sufficient to advise Dr. Storms of her rights, as shown by the evidence that Dr. Storms knew she could be considered faculty or senior staff, which is the category of employees generally eligible for the Plan.

First, as proven by credible testimony at trial, the volume of materials distributed by the University was substantial. Beginning with the July 10, 1973 change of status memorandum, which Dr. Storms does not recall but does not deny receiving, the University has produced evidence of more than 30 documents related to the retirement plan sent either to Dr. Storms' home address or her campus mail address. These included summary plan descriptions ("SPD's"), retirement updates, benefits summaries, benefits newsletters, and summary annual reports. (See Defs.' Ex. 19, 92-93, 97, 98, 104-117, 119, 120-132, 155, 161-163, 184). Dr. Storms specifically admitted "periodically" receiving documents such as a January 1992 benefits summary (Def. Ex. 97), a 1991 Retirement update (Def. Ex. 93), a 1990 Summary Annual Report (Def. Ex. 92), and others which were produced from her files. (Tr. 359-363, 371-72). Others, such as the December 1986 Retirement Update (Def. Ex. 122), she did not recall but did

---

[2] Dr. Storms admits receiving notice in 1994, when she visited the benefits office in connection with a separation from her husband. She did not enroll in the plan until January 1997.

2

not deny receiving. (Tr. 364-65.) The plaintiff's ability to raise questions about a particular mailing on a particular date cannot overcome the sheer weight of the defendants' proof on this issue, particularly because the addresses used for these notifications was tied into the computerized payroll system (see Tr. 468-472), and there was not evidence that Dr. Storms experienced difficulty receiving her salary.[3]

Second, as noted in the Memorandum of September 29, 2000, the language contained in the summary plan descriptions was sufficient to explain that "all full-time and part-time faculty and senior staff members" could participate in the plan, once they had achieved sufficient age (35) or years of service (2) upon completion of an application form. (Def. Ex. 160, SPD June 1986 at 2). Similar language was contained in many of the less formal notifications sent to Dr. Storms.

Third, considering the testimony of Dorothy Boan concerning her regular procedures in the fall of 1986, corroborated by the contemporaneous note which logically implies she contacted Dr. Storms to orient her, (Def. Ex. 44) it is probable that Dr. Storms received orientation materials, including the 1986 SPD, upon her return to the University. At trial, Dr. Storms simply did not recall what information she received. (Tr. 350-51). Similarly, the testimony of Frank Kellner, Sandra Cobb, and Bernie Kuczak, considered together, makes it probable that Dr. Storms was sent the July 1988 SPD, and others, either at her home or at her office.

---

[3] Dr. Nancy Ator testified at trial that she did not receive a benefits orientation upon becoming a Hopkins faculty member in 1982. Dr. Ator nevertheless assumed that she was eligible for retirement, contrary to Dr. Storms' assumption, but did not realize she had to enroll. She was sent a letter in 1984 urging her to do so. While at the time of her deposition she did not recall receiving that letter, by the time of trial, she had concluded that she probably did. (Tr. 238-40). She enrolled in the plan in August 1984. Considered in total, her testimony does not support the conclusion that Dr. Storms was sent no adequate notification of her rights at any time up until 1994.

3

Fourth, resolving the principal issue that prevented entry of summary judgment, the evidence at trial clarified the fact that a "research associate" such as Dr. Storms fell within the category of "faculty and senior staff" eligible to participate in the retirement plan. It also established that Dr. Storms knew she could be considered a member of the Hopkins faculty.

Dr. Storms was appointed as a "research associate" in 1977. (Tr. 338; Def. Ex. 33, 34).[4] When she returned to Hopkins employment in 1986 after earning her doctoral degree, she was appointed an "associate." (Tr. 340-41), and in 1990 she became a "research associate." (Def. Ex. 50). While maintaining a distinction between "teaching" or "professional faculty," and "faculty in general," Dr. Storms understood herself as an associate to be part of the faculty at least in "that broad sense." (Tr. 341-43). In a 1984 resume, Dr. Storms described her recent work history (1981-1984) as follows:

> During this period I have been an Associate faculty member in the
> Department of International Health, Johns Hopkins University,
> School of Hygiene and Public Health.

(Def. Ex. 5; Tr. 346-47). She also listed her "Teaching Activities" as an "instructor" and "lecturer" at Hopkins. (Id.). In 1992, she signed a "contractor employee biographical data sheet" identifying herself as "associate faculty" from October 1986 to the present. (Def. Ex. 52; Tr. 349-50). In November 1996, she also described herself in a curriculum vitae as "faculty" at Hopkins from 1986 to the present, (Def. Ex. 7; Tr. 344-46), although in January 1996 she simply described her positions as "research associate" and "associate." (Plf. Ex. 26).

Perhaps understandably, but unfortunately, Dr. Storms simply assumed that her husband would get some kind of pension, which she would share, and accordingly she just "didn't look

---

[4] The chronology of her positions at Hopkins is stated more fully in the September 29, 2000 Memorandum.

into it." (Tr. 357). She also assumed that because she was not "teaching faculty," she was not herself eligible for the retirement plan. (Tr. 358). This assumption, however, was not based on anything the university told her. (Tr. 358-59, 399-400).

In summary, the University's method of notifying participants of their eligibility and their need to take the affirmative step of enrolling in the retirement plan, while not perfect, was sufficient under ERISA. Dr. Storms' assumption about her lack of eligibility, while credible, was neither objectively reasonable nor the result of any misleading or inadequate information from the defendants. Accordingly, no breach of fiduciary duty has been shown.

Judgment will be entered by separate Order.

/Jan. 2, 2002
Date

/s/ Catherine C. Blake
Catherine C. Blake
United States District Judge